RENDERED: MAY 5, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000271-DGE

REBEKAH MCCARTY                                                 APPELLANT

ON REVIEW FROM COURT OF APPEALS

V.                CASE NO. 2014-CA-000113-ME

BATH CIRCUIT COURT NO. 12-CI-00123

KENNETH FARIED                                          APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING**

Following an evidentiary hearing, the trial court found that the parents' combined monthly adjusted gross income exceeded the statutory guidelines and ordered the noncustodial parent to pay $4,250 a month in child support. The Court of Appeals, considering the issue a matter of first impression, vacated the child support order, holding that the amount was arbitrary. We reverse the Court of Appeals and reinstate the trial court's order establishing child support.

## I. BACKGROUND.

Rebekah McCarty and Kenneth Faried were friends while they were students at Morehead State University. On March 12, 2010, McCarty gave birth to their daughter, Kyra. Following the birth, McCarty dropped out of college to care for Kyra and returned to live with her parents in Bath County. Faried graduated and was drafted by the National Basketball Association

(NBA)'s Denver Nuggets in June 2011. The parties never married and never cohabitated.

Because Faried was drafted during a lockout, he did not begin drawing his NBA salary until December 2011. In the interim, he took out a loan of between $100,000 and $300,000 for living expenses and began voluntarily paying $500 a month to support Kyra. Sometime later, McCarty asked for an increase, and Faried began paying $1,000 a month.

On September 27, 2012, McCarty filed a motion for child support in Bath Circuit Court and requested $7,500 a month from Faried. In a subsequent temporary order, the trial court ordered Faried to pay $2,000 a month in child support and to provide for Kyra's health insurance and daycare costs. The court also stated in the order that if it ultimately awarded a different amount of child support, that award would be retroactive to the date of McCarty's motion for child support.

On June 27, 2013, the trial court held an evidentiary hearing to determine child support. McCarty testified that she continues to live in her parents' four-bedroom house, where she shares a bedroom with Kyra; her later-born son, Malachi; and occasionally Malachi's father, with whom she is in a committed relationship. McCarty's father, mother, brother, sister, and niece occupy the other bedrooms. McCarty also testified that she works 30 to 35 hours a week at a gas station and earns about $1,050 a month. Her only other sources of "income" are groceries bought by her parents and voluntary, inconsistent child support payments from Malachi's father. At the time of the

2

hearing, McCarty estimated that she had received approximately $300 in child support from Malachi's father.[1]

As for her monthly expenses, McCarty testified that she pays $239 to her grandmother for the use of a 2007 Chevy Equinox, $400 to $500 to fill the car with gas, $58 for car insurance, $200 to $300 for food, $150 for cell phone service, and $200 for personal expenses. She also stated that she is covered under her parents' health insurance policy and that Kyra's health insurance and out-of-pocket medical expenses are covered by Faried. Faried also pays $75 a week directly to Kyra's daycare facility.

McCarty requested court-ordered child support because her minimal income could not support Kyra's needs and because she hoped to better Kyra's quality of life. Specifically, McCarty wanted to move out of her parents' house, but she could not afford to do so with her current amount of income. McCarty's interest in moving was driven by wanting Kyra to have her own bedroom, a backyard, and internet access—in part so that Kyra could video-conference with Faried in Denver. She testified that she had spoken to a carpenter who was building a house in neighboring Rowan County that would rent for about $900 a month (excluding utility costs) and that he agreed to hold the house for her. Furthermore, McCarty introduced a summary and supporting documents detailing five other houses for sale in the Morehead area.

---

[1] Malachi's father also played basketball at Morehead and hopes to play professional basketball in Europe.

McCarty estimated that, without the support of her parents, her monthly food costs would be $300 to $500. McCarty testified that if she had more money she would like to spend approximately $100 a month on clothes for Kyra. However, she also stated that Faried had twice sent Kyra two boxes of clothing that he had received because of his endorsement contract and that she had no more room in her parents' house for clothes for Kyra. Finally, McCarty also requested child support because she wanted Kyra to be able to enjoy cultural activities—such as going to the zoo, museums and on vacations[2]—and perhaps enroll in gymnastics classes or other extracurricular activities.

In further support of what she believed Kyra's monthly needs to be, McCarty submitted the following list:

| | |
|---|---|
| A comfortable and stable home, in a safe neighborhood, with her own bedroom and places to play: | $2,000 |
| Standard utilities, access to reliable phone, internet connection: | $350 |
| Safe and reliable transportation: | $800 |
| Healthful, varied and nutritious meals: | $600 |
| Routine medical, dental, and vision care: | $50 |
| Clothes that fit and she looks and feels good in: | $200 |
| Cultural, educational, and extracurricular opportunities: | $250 |
| Entertainment, gifts, simple luxuries: | $250 |

---

[2] McCarty testified that she was able to take Kyra to Florida once, but only because she was able to stay with Malachi's father's family for free.

4

|                                    |        |
|------------------------------------|--------|
| Education Planning and Savings:    | $500   |
| Total:                             | $5,000 |

Faried testified and submitted exhibits detailing his income and expenses. As a professional basketball player, Faried's NBA salary is $1,434,665;[3] plus he also earns $197,240 from an endorsement contract. However, Faried also testified that his net earnings in 2012 were substantially reduced by several "business expenses," including: NBA Escrow contributions of $132,000, agent fees of $43,000, financial management fees of $25,000, assistant's salary of $24,000, NBA Player Association fees of $10,000, NBA fines of $12,000,[4] cell phone service of $4,440, and personal trainer costs of $2,784. Faried's net income is further reduced by substantial income taxes, retirement contributions, and insurance payments.

As for personal expenses, Faried rents a three-bedroom apartment in Denver for $4,100 for himself and his brother and pays $4,517 per semester for his brother to attend college. He also financially supports his separated parents, paying: $2,300 per month for his mother to rent a four-bedroom house in New Jersey; $1,300 per month for his father to rent a studio apartment in Denver; utility costs for both households; and $1,000 monthly allowance and cell phone service for each.

---

[3] Faried signed a four-year contract in 2011, and he testified that he does not expect his NBA salary to substantially change over the next four years.

[4] Faried testified that the NBA levied fines against him for committing technical fouls in games throughout the season.

Faried also testified that Kyra primarily lives with McCarty in Kentucky but that Kyra lives with him in Denver for several months a year. When she stays with him, he pays for her transportation and together they have gone bowling and to the movies. Kyra also enjoys the use of an iPad in Denver, and Faried took her to Disney World. Faried stated that he had no objection to paying for Kyra's medical expenses and daycare and that he would pay for preschool and gymnastics classes when Kyra is of age. Faried testified that he believes $2,000 a month in child support plus $500 a month for an education fund for Kyra is appropriate.

Finally, Melissa DeArk, a Certified Public Accountant, testified as an expert witness for Faried. Ms. DeArk reviewed Faried's financial statements and tax returns and calculated his net income, *i.e.* the money available for discretionary spending, to be $638,183 per year or $53,182 per month.[5] Ms. DeArk arrived at this figure by subtracting Faried's "business expenses" totaling $253,224, his retirement contributions of $38,879, and his tax liability of $701,919 from his total income of $1,632,205. Ms. DeArk also researched census data and testified that the average Bath County resident pays $842 for a home mortgage, utility costs, and property taxes while the average Rowan County resident pays $946.

Following the hearing, the trial court entered an order on October 31, 2013, establishing joint custody and directing Faried to pay $4,250 a month in

---

[5] We note that net income is not the same as "gross income" as defined under Kentucky Revised Statute (KRS) 403.212(2)(6). Nevertheless, determining Faried's exact gross income is not necessary for the purposes of this appeal.

child support and to set up an "educational fund" for Kyra, in which he will deposit $500 a month "to be used for summer camps and future educational opportunities." In doing so, the court found that deviation from the statutory child support guidelines was appropriate because of the substantial combined income of the parties and relied on the child's reasonable needs. To that end, the trial court found Kyra's reasonable needs were as follows:

a. Housing-$1200.00 per month
b. Day care-$500.00 per month
c. Dependable vehicle-$500.00 per month
d. Vehicle maintenance-$150.00 per month
e. Gas for car-$350.00 per month
f. Proper insurance for car-$200.00 per month
g. Nutritious food-$400.00 per month
h. Utilities including internet-$350.00 per month
i. Gifts (birthday parties/outings for/with other children)-$50.00 per month
j. Activities-gymnastics and educational-$400.00 per month
k. Clothing-$100.00 per month
l. Over the counter medical expenses-$50.00
    Total: 4,250.00

The trial court further ordered Faried to maintain Kyra under his health insurance coverage and to "arrange" for McCarty to be counseled in age appropriate nutritional and exercise options for Kyra as well as financial counseling. The order also made the monthly amount of $4,250 retroactive to October 1, 2012 and calculated back child support to be $24,100.

Faried moved to alter, amend, or vacate the order, and the trial court entered an amended order on January 10, 2014. The court ordered the same amount in child support—$4,250—and maintained that Kyra's reasonable

7

needs were nearly identical to its original order.[6] However, the court vacated the requirement for Faried to set aside $500 per month for future educational needs and alternatively ordered the parties to divide all educational expenses in accordance with their percentage of income: 1% to McCarty and 99% to Faried. Furthermore, the court vacated Faried's duty to provide nutritional, exercise, and financial counseling for McCarty but ordered McCarty to attend such counseling on her own. Finally, in response to Faried's argument that a portion of child support will be used to support McCarty herself, Malachi, and Malachi's father, the court reasoned that Kyra's needs "are what they are, regardless of the number of individuals in the household" or who else might receive a benefit.

The Court of Appeals vacated and remanded the trial court's award of child support. In doing so, the Court held that the trial court should not have relied on McCarty's "speculative" testimony regarding housing, educational, and extra-curricular costs. Furthermore, the Court noted that even if the trial court could rely on that testimony, McCarty's expenses would fall well short of $4,250 a month. The Court also raised issue with the retroactivity of the order, finding it would create "an untenable result of reimbursing McCarty for expenses she has never incurred." Thus, the Court held that the trial court had abused its discretion because it had not based its award on Kyra's reasonable needs as set out in the court's "specific supporting findings."

---

[6] The court amended the "Activities" need in subsection (j) to read: "Activities-gymnastics, sports or other extra-curricular activities-$400.00 per month."

8

## II.   STANDARD OF REVIEW.

We review the establishment, modification, and enforcement of child support obligations for abuse of discretion. *Plattner v. Plattner*, 228 S.W.3d 577, 579 (Ky. App. 2007). The test for abuse of discretion is whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Downing v. Downing*, 45 S.W.3d 449, 454 (Ky. App. 2001) (citing G*oodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)). "[And] generally, as long as the trial court gives due consideration to the parties' financial circumstances and the child's needs, and either conforms to the statutory prescriptions or adequately justifies deviating therefrom, this Court will not disturb its rulings." *Van Meter v. Smith*, 14 S.W.3d 569, 572 (Ky. App. 2000) (citing *Bradley v. Bradley*, 473 S.W.2d 117 (Ky. 1971)).

## III.   ANALYSIS.

A trial court's first step when establishing child support is to attempt to comply with Kentucky's statutory guidelines as codified in Kentucky Revised Statute (KRS) 403.212. In a typical case, a court will calculate the parents' combined monthly adjusted gross income and then determine the appropriate child support obligation amount from the guidelines table. KRS 403.212(2)-(7). However, because the table ends at $15,000 in combined monthly income, KRS 403.212(5) provides: "The court may use its judicial discretion in determining child support in circumstances where combined adjusted parental gross income exceeds the uppermost levels of the guideline table." Because we have not had occasion to interpret the setting of child support above the guidelines,

9

we turn to representative cases from the Court of Appeals: *Downing v. Downing*, 45 S.W.3d 449 (Ky. App. 2001) and *Bell v. Cartwright*, 277 S.W.3d 631 (Ky. App. 2009). While we are not bound by their holdings, they are a helpful staring point.

In *Downing v. Downing*, the Court of Appeals addressed how a trial court should reasonably adjust child support when parental income exceeded the guidelines. 45 S.W.3d at 454. The Court rejected the "share the wealth" model where child support is determined by mathematically extrapolating over and above the maximum guidelines without entering specific findings as to the needs of the children. *Id.* at 455 (citations omitted). The Court reasoned that a strict reliance on a mathematical extrapolation from the guidelines could result in unreasonable increases in child support, which would only serve to provide extravagance and not reflect the child's actual needs. *Id.* at 456.

Instead, the Court found that, "while to some degree children have a right to share in each parent's standard of living, child support must be set in an amount which is reasonably and rationally related to the realistic needs of the children." *Id.* The Court referred to this analysis as the "Three Pony Rule," *i.e.* no child, no matter how wealthy his or her parents, needs more than three ponies. *Id.* (citing *Matter of Marriage of Patterson*, 22 Kan.App.2d 522, 920 P.2d 450, 455 (1996)). Therefore, the Court concluded that "any decision to set child support above the guidelines must be based primarily on the child's needs, as set out in specific supporting findings." *Id.* To further aid courts in determining the child's needs, the Court set forth non-exhaustive factors to be

10

considered, including: the standard of living which the children enjoyed during and after the marriage; the parents' financial ability to meet that lifestyle; the parents' financial circumstances, station in life, age, and physical condition. *Id.* at 456-57. Applying that standard, the *Downing* Court concluded that the trial court's increase of child support was arbitrary because the award was based "almost entirely" on mathematical extrapolations from the guidelines without any other supporting findings or evidence in the record. *Id.* at 456.

In *Bell v. Cartwright,* the Court of Appeals reviewed another case in which a trial court failed to support its award of increased child support. 277 S.W.3d at 631-32. There, the Court vacated the order increasing support because it did not contain specific supporting findings regarding the child's reasonable needs. *Id.* at 633. In fact, the Court noted that the order "explicitly acknowledged that there was no evidence offered regarding the cost of private school, sports camps, or private daycare," and the Court found that the mother's request for money to purchase a new home was "speculative." *Id.*

Here, the Court of Appeals concluded that the trial court's order of child support suffered from the same defects as *Downing* and *Bell.* Although the Court agreed with the trial court that deviation from the guidelines was appropriate, the Court held that the order did not set out specific supportive findings as to Kyra's needs. Additionally, the Court characterized some of McCarty's requests for support as speculative, saying "if and when McCarty rents or purchases a home [or enrolls Kyra in gymnastics], she may request a modification of the child support award."

11

Because the Court of Appeals imposed an overly burdensome standard, we reverse and reinstate the trial court's order.

In regard to the child support award as a whole, the trial court did not abuse its discretion because it set out specific supportive findings and the award was reasonable in light of those findings and the record. We hold that a trial court's decision, when setting child support over and above the guidelines, must be based on the best interest of the child. When making that determination, a trial court may use its judicial discretion with regard to weighing factors such as: the needs of the child, the financial circumstances of the parents, and the reasonable lifestyle the child may have been accustomed to before or after the parents separated.[7] On review, an order setting child support above the guidelines will be affirmed so long as the trial court sets out specific supportive findings and the award, as a whole, is reasonable in light of those findings and the record.

With the preceding in mind, we hold that the trial court herein did not abuse its discretion when setting child support for Kyra. Her parents' combined monthly income far exceeds the guidelines; therefore, it is within the trial court's discretion to set support. The trial court held a half-day evidentiary hearing, at which both parents testified extensively about Kyra's current and projected needs and lifestyle as well their own financial circumstances and lifestyle expectations. That testimony included what McCarty and Faried both believed were Kyra's reasonable needs, concluding

---

[7] This is not an exclusive list.

12

between $2,575 and $5,000 was appropriate. Furthermore, McCarty testified that she shares a bedroom with Kyra in her parents' house because she cannot afford to move and that her monthly income of $1,050 is not sufficient to cover her necessary expenses, much less allow for discretionary spending on Kyra. Faried testified that he could afford to fly Kyra to his three-bedroom apartment in Denver, provide her with an iPad, and take her to Disney World.

The trial court heard this testimony and much more and ordered Faried, as the non-custodial parent to pay $4,250 a month in child support. In its original order, the trial court set forth specific supportive findings for the award, including a categorical list of Kyra's needs, a detailed contrast of Kyra's lifestyles with each parent, and an exhaustive compilation of each parent's income and expenses. Furthermore, the court ordered amount was within the range set forth by the parties—between $2,575 and $5,000. The court was entitled in its discretion to find McCarty's opinion of Kyra's needs to be more credible than Faried's opinion, or, as was more likely the case, the court found a combination of the two was appropriate. Moreover, in its amended order, the court considered each of Faried's objections and vacated several portions of its original order where it was persuaded by Faried's positions.

The Court of Appeals undertook a detailed analysis of the testimony offered at the hearing and rejected the trial court's determination of Kyra's reasonable needs. While the Court merely remanded the child support order, the Court improperly substituted its understanding of Kyra's needs for the trial court's supported finding. Instead, the proper role of a reviewing court is to

13

judge whether the trial court abused its discretion by ordering a clearly unreasonable amount of child support or failing to support its award with specific findings. We detect no such error herein. As stated above, the trial court set out specific and detailed findings in support of its award of $4,250. As such, we have no trouble concluding that child support in the amount of $4,250 is reasonable and in Kyra's best interest, taking into account her needs, her parents' substantial combined income, and the disparate lifestyle between the two households.

Additionally, we hold that McCarty's requests for child support for housing and extracurricular activities were not speculative. First, the Court of Appeals relied on *Bell* for its holding that McCarty had failed to support her requests of housing and extracurricular activity support. Setting aside that *Bell* is merely persuasive on this Court, the Court of Appeals's interpretation of *Bell* was misplaced. The *Bell* Court deemed the petitioner's request for increased child support to purchase a new home was speculative because "she failed to inquire into the costs of homes" or supplement the record with supporting documents. 277 S.W.3d at 633. Herein, McCarty testified that she had personally inquired into renting a newly constructed house in Morehead for $900 a month and that the homebuilder had assured her that he would hold the house for her. Furthermore, McCarty introduced documentation regarding five houses for sale in the area, which included the listed price and monthly payment projections for each. We cannot say that this proof is speculative or out of line with *Bell*'s minimal requirements.

14

Second, while we agree *Downing* and *Bell* are helpful in some respects, we are not bound by their holdings and find their reasoning is distinguishable. Both cases concern modification of existing child support awards and thus require "a showing of a material change in circumstances that is substantial and continuing." KRS 403.213(1). An initial establishment of child support requires no such showing. Therefore, McCarty was not required to show that every dollar requested in child support was destined to cover a specific expense. It is the petitioner's duty to make a request for child support that is rationally related to the best interest of her child, and it is the trial court's duty, in turn, to consider the request and any supporting proof at trial and to award a reasonable amount of child support. McCarty requested child support for both housing and extracurricular activities in her list of Kyra's needs; she elaborated and specified those needs at trial; and the trial court, finding those requests to be reasonable, allotted child support in an amount it found to be sufficient.

Third, the Court of Appeals has cast petitioners similarly situated to McCarty between a rock and a hard place. McCarty testified that her primary desire was to move Kyra out of the bedroom they shared in her parents' house but that she could not afford to do so with her current income. The Court of Appeals concluded that, while moving was not unreasonable, McCarty had to purchase or begin renting a new home before child support could be allocated for that need. The flaw in this construction is obvious: without the means to support the move, the move will not occur. In fact, without additional monthly

income McCarty would never qualify to purchase a home, and to expect her to lease a home without the income to pay the rent would be foolhardy and irresponsible. Similarly, without the funds to enroll Kyra in extracurricular activities, those opportunities will not be practically available. It is for the trial court to determine whether these requests are reasonably calculated to support the child's needs, regardless of whether the petitioner provides an invoice for the expense.

Finally, as to the retroactivity of the trial court's order, we find no error. Faried argues that making the order retroactive was an abuse of discretion in that McCarty had not incurred additional expenses for Kyra after the temporary support order was set and therefore incurred no expenses for which she should be reimbursed by an arrearage judgment. We find no merit to this argument for two reasons. First, it is undisputed that the effective date of any increase in child support is within the sound discretion of the trial court. *Giacalone v. Giacalone*, 876 S.W.2d 616, 620 (Ky. App. 1994) (citing *Ullman v. Ullman*, 302 S.W.2d 849, 851 (Ky. 1957)). Here, the court forewarned through its temporary order that any increase in child support would be made retroactive to the date of McCarty's motion for child support (a common practice), and the court did just that in its final child support order.

Second, the order establishing child support was not meant to reimburse specific expenses incurred after the trial court entered the temporary order. Instead, the child support order represented McCarty's culmination of proof and the trial court's judgment as to what amount is reasonable to support

16

Kyra. While that figure was determined months after McCarty's motion, the trial court ordered that Kyra was entitled to that amount of support from Faried during the interim and going forward. In other words, Kyra's reasonable needs did not manifest the day the final child support order was entered; those needs existed at least as of the date McCarty made a motion for support. Thus, the trial court ordered that the child support award be applied retroactively to the date of the motion. Absent a significant change in circumstances, that order was not arbitrary, unreasonable, erroneous, or an abuse of discretion.

## IV. CONCLUSION.

For the reasons stated above, we reverse the Court of Appeals and reinstate the Bath Circuit Court's orders.

Minton, C.J., Hughes, Keller, Venters and Wright, JJ., concur. Noble, J., concurs in result only. Cunningham, J., not sitting.

COUNSEL FOR APPELLANT:

Eileen M. O'Brien
Stoll Keenon Ogden, PLLC

COUNSEL FOR APPELLEE:

Mary Janice Lintner
Lynch, Cox, Gilman & Goodman, PSC