RENDERED: JUNE 14, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1427-MR

SCOTT WILLIAM BRYANT                                         APPELLANT

v.          APPEAL FROM JEFFERSON CIRCUIT COURT
            HONORABLE SHELLEY M. SANTRY, JUDGE
            ACTION NO. 19-CI-502514

HELEN RYDZEWSKI BRYANT                                       APPELLEE

AND

NO. 2021-CA-1494-MR

HELEN RYDZEWSKI BRYANT                               CROSS-APPELLANT

v.      CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
            HONORABLE SHELLEY M. SANTRY, JUDGE
            ACTION NO. 19-CI-502514

SCOTT WILLIAM BRYANT                                 CROSS-APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  A. JONES, KAREM, AND LAMBERT, JUDGES.

JONES, A., JUDGE:  This appeal and cross-appeal involve numerous issues related to the family court's dissolution order and its amended order, including the classification of property, maintenance, child support, attorney's fees, and the alleged dissipation of assets.  For the reasons set forth below, we affirm in part, reverse in part, and remand for entry of a new order consistent with this Opinion.

## I. BACKGROUND

Scott and Helen were married on September 21, 2002.  Their first child was born in 2010.  A second child followed in 2012.  They separated in July 2019, and Scott filed a petition seeking dissolution of the marriage the following month.  With the assistance of a mediator, the parties were able to reach a written agreement for joint legal custody and a detailed timesharing schedule.  The parties' agreed order was incorporated by reference into the final dissolution decree.

Despite repeated attempts, the parties were not able to reach an agreement on the remaining issues, necessitating an evidentiary hearing before the family court.  The family court conducted the hearing on May 20, 2021.  Both parties testified at the hearing and introduced numerous items into evidence for the

family court's consideration. After the hearing, the following issues were submitted to the family court for decision: (1) child support; (2) division of the children's uninsured medical expenses; (3) tuition for the children's private schools; (4) Helen's nonmarital assets claim; (5) division of the marital assets; (6) Helen's request for maintenance; (7) Helen's request for attorney's fees pursuant to KRS[1] 403.220; and (8) Helen's dissipation claim.

On August 18, 2021, the family court entered a detailed twenty-six-page order resolving all the outstanding issues. The order was followed by a separate decree of dissolution entered on August 24, 2021. On August 30, 2021, Scott filed a CR[2] 59.05 motion to alter, vacate, or amend certain portions of the August 18, 2021 order. By its order entered November 10, 2021, the family court granted Scott's motion in part and entered an order amending various portions of its original order. This appeal and cross-appeal followed. Further facts will be discussed below.

## II. APPEAL NO. 2021-CA-1427-MR

In his appeal, Scott asserts six errors by the family court: (1) the finding that Helen met her burden of proof to trace her alleged nonmarital property interests in the parties' beach house; (2) imputing income to Scott for purposes of

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Civil Procedure.

child support; (3) imputing income to Scott for purposes of maintenance; (4) only imputing a yearly income of $20,025.60 to Helen; (5) deviating from Kentucky Child Support Guidelines; and (6) awarding Helen all her attorney's fees and costs pursuant to KRS 403.220.

## A. Nonmarital Property / Tracing

Helen worked for Macerich, a company that owns and manages commercial retail establishments throughout the United States, from August 1998 through May 30, 2013. Macerich offered its employees the ability to participate in a 401(k) plan as well as a nonqualified deferred compensation plan ("DCP"). Helen participated in both plans. In 2013, pursuant to the terms of Helen's agreement with Macerich, she was required to cash out her DCP. After taxes were withheld, Helen received a payout of $186,424.40 from the DCP. Helen produced banking records showing that on July 1, 2013, she deposited $109,392.47 of the DCP payout into the parties' jointly held PNC money market account.[3] Prior to that deposit, the account had a beginning balance of $95,852.97.

Helen maintains the money remained in the account until October 9, 2015, when the parties used a portion of it, $96,169.51, toward the purchase of a beach house in Florida. Obviously, Helen cannot claim that the entire DCP payment is her separate, nonmarital property since it is undisputed that she

---

[3] It is unclear what Helen did with the other $77,031.93.

participated in the plan during her marriage to Scott. Rather, Helen asserts that a portion of payment was comprised of compensation she deferred prior to marrying Scott in 2002. At the hearing, Helen submitted W-2 tax forms that she claims prove that 28.57% of the DCP payment was her nonmarital property. Likewise, she claims that 28.57% of the down payment on the Florida house, $27,475.63 was comprised of her nonmarital property. Helen then argues that, based on the parties' total equity contribution toward the Florida beach house of $129,421.45, she has a 21.23% nonmarital interest in the beach house's equity.

During the hearing, Scott argued that the W-2 documents Helen relied on to prove her nonmarital claim in the DCP payment showed the amount of Helen's nonmarital contributions to her 401(k) retirement plan and not how much money she contributed to the DCP. In her proposed findings of fact and conclusions of law, Helen appears to have conceded that the W-2s do not in fact prove how much money she contributed to the DCP prior to marrying Scott. Nevertheless, Helen argued that her testimony in combination with the PNC bank records was sufficient to prove her nonmarital interest in the Florida beach house.

In its original order, the family court concluded that, based on her testimony as well as the W-2s from 2000, 2001, and 2002 "documenting her total contributions to tax-deferred retirement accounts," Helen had proven to the family court's satisfaction "that $30,265.13 of the total down payment on the beach house

-5-

was her pre-marital property" making her total "non-marital percentage of the Florida beach house 23.38%." (R. at 446.) In the same order, the family court concluded that Helen had failed to prove any non-marital interest in her Macerich 401(k).

In his CR 59.05 motion to alter, vacate, or amend, Scott asserted that the family court plainly erred because the family court and the parties acknowledged that the W-2s specifically denoted contributions made to Helen's 401(k) account and not to her DCP. The family court entered an order partially granting Scott's motion as follows:

> First, [Scott] alleges the Court made a critical error in erroneously relying on the tracing concepts articulated in *Chenault v. Chenault*[4] when determining whether [Helen] had a pre-marital interest in her Macerich Deferred Compensation account and, therefore, the Florida Beach Home. The decision in *Chenault* relaxed the "draconian" tracing requirements of prior case law. As the Court laid out in its August 18, 2021 Order, "While it is the parties' obligation to trace out non-marital interests, the tracing obligation does not require exact precision. When a divorce occurs sometime after the marriage (18 years here), the documents necessary to show precise tracing may not exist. Such is true in this case. Thus, a party need only show the source of non-marital funds by testimony or evidence and that such went into a currently held asset. It is enough to show the Court, as least where money is concerned, that . . . the balance of the account was never reduced below the amount of the nonmarital funds deposited." *Allen v. Allen*, 584 S.W.2d 599, 600 (Ky. App. 1979). Where real

---

[4] 799 S.W.2d 575 (Ky. 1990).

estate is concerned, a party need only show the pre-marital source of funds and the percentage of the non-marital contribution to the total. *Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky. App. 1981).

[Scott] alleges the Court failed to account for the later decision in *Terwilliger v. Terwilliger*,[5] which clarified that the relaxed tracing requirements laid out in *Chenault* were applicable when the Court was seeking to protect a less sophisticated party. [Scott] argues that [Helen], who has a bachelor's degree in Economics and held a management position in her former career, is more like Mr. Terwilliger, who was found to have the requisite record-keeping skills to adequately trace pre-marital assets and "is not the type of unsophisticated litigant" that the Kentucky Supreme Court sought to protect by relaxing the tracing standard. Furthermore, [Scott] alleges that even if *Chenault* were the appropriate tracing standard to use, the Court erroneously failed to account for other potential sources of [Helen's] non-marital claim and [Helen] still failed to meet her burden.

While [Scott] argues the Court misread *Chenault* and *Terwilliger* in finding [Helen] had a non-marital claim in her Macerich Deferred Compensation account, the Court believes [Scott] is the one selectively applying the facts of each case to suit his purpose. Let the Court be clear now. The Court found, in accordance with the holdings of both *Chenault* and *Terwilliger*, that [Helen's] testimony and PNC Bank Statements were sufficient to prove: she worked for Macerich for four years prior to the marriage, she contributed to the Deferred Compensation during that four years, the down payment for the Florida House came from the proceeds of that account, and that due to the length of the marriage it was difficult to provide documentary proof of how much she contributed pre-marriage so a proportional allocation was appropriate. Unlike Terwilliger, who was both in charge

---

[5] 64 S.W.3d 816 (Ky. 2002).

of the business interests in dispute and provided fraudulent documentation about marital asset values to the Court, we find [Helen] to be a credible witness and the tracing requirements to have been met. While [Scott] is welcome to disagree with this interpretation, the Court's discretion in this matter is only subject to the clearly erroneous standard and great deference is given to the Court to adjudge the credibility of witnesses and evidence. *Cochran v. Cochran*, 746 S.W.2d 568, 569 (Ky. App. 1998). The Court is confident that its decision on this issue will stand up to such scrutiny and therefore [Scott's] request to alter, amend or vacate the finding that [Helen] had a premarital interest in the Florida Beach House is DENIED.

Where the Court does agree with [Scott] is that [Helen] did, in fact, provide adequate documentation for the $30,265.13 of pre-marital interest in her Macerich 401(k) and the Court incorrectly attributed the contributions made on her W-2s to her Deferred Compensation account rather than her Macerich 401(k). Given the complexity of this case and the considerable financial assets at play, the Court acknowledges that it simply made a mistake in this attribution and [Helen] did provide sufficient evidence of her pre-marital interest in that account. As such, [Helen] does have a pre-marital interest in the 401(k) account of $30,265.13 and [Scott's] motion to alter, amend or vacate the order to reflect that is GRANTED. With this correction, the Macerich 401(k) account shall be divided by Qualified Domestic Relations Order.

(R. at 494-96.)

We first note that the family court found Helen had a slightly higher percentage of nonmarital interest in the Florida beach house than even Helen had claimed she was entitled to receive. In her proposed findings of fact and

conclusions of law, Helen claimed a 21.23% interest in the beach house. The family court determined, however, that Helen actually had a 23.38% interest. To reach this percentage, it appears the family court presumed that Helen's total DCP deposit of $109,392.47 into the joint PNC account included $30,265.13 of nonmarital funds and that the entire amount of the nonmarital funds were used when the parties made their down payment on the Florida house, even though the total balance of the account at that time was around $215,000.

Even ignoring the obvious problem of the funds having been comingled with marital funds in an account that was used for other purposes, Helen never proved by clear and convincing evidence what amount of money she contributed to the DCP prior to marrying Scott. The $30,265.13 figure was based on Helen's testimony that the W-2 documents showed contributions into the DCP. However, as the family court found in its amended order, the W-2 documents reflected contributions to the 401(k) plan and not to the DCP.

In a dissolution proceeding, KRS 403.190(1) requires a family court to "assign each spouse's property to him." The family court's findings as to the marital or nonmarital nature of property will not be disturbed on appeal absent clear error. CR 52.01. A spouse can offer evidence to rebut the presumption that all property acquired after the marriage is marital in nature by "tracing" property acquired during the marriage to non-marital assets; *see Chenault*, 799 S.W.2d at

578. Tracing is "[t]he process of tracking property's ownership or characteristics from the time of its origin to the present." *Tracing*, BLACK'S LAW DICTIONARY (7th ed. 1999). A party attempting to show that property is nonmarital in nature bears the burden of proof on that issue "by clear and convincing evidence." *Brosick v. Brosick*, 974 S.W.2d 498, 502 (Ky. App. 1998).

*Chenault* recognized that precision of asset tracing might be appropriate for skilled businesspersons but would be inappropriate and disadvantageous to those of lesser business acumen. Accordingly, the Court held that mathematical precision with respect to tracing would no longer be required in every case. *Chenault*, 799 S.W.2d at 578. "While *Chenault* recognized the potential difficulties of tracing and sought to relax the draconian requirements laid down in prior case law, it did not do away with the tracing requirements altogether." *Terwilliger v. Terwilliger*, 64 S.W.3d 816, 821 (Ky. 2002). And, even under *Chenault*'s relaxed standards, "[t]o satisfy the tracing requirement, the party must prove when the property was acquired and transferred, the asset into which it was transferred, and its value at those times." *Rearden v. Rearden*, 296 S.W.3d 438, 441-42 (Ky. App. 2009). Additionally, "[w]here the party claiming the non-marital interest is a skilled business person with extensive record keeping experience, the courts may be justified in requiring documentation to trace non-

-10-

marital assets into marital property." *Maclean v. Middleton*, 419 S.W.3d 755, 767 (Ky. App. 2014).

It is indisputable that whatever amount of money Helen contributed to the DCP prior to her marriage was her separate property at the time of payout. The problem in this case, however, is that Helen was unable to provide any testimony or evidence to support what percentage of the DCP was Helen's separate property. Helen testified that after the parties' marriage she was contributing heavily to her DCP and her 401(k), sometimes as much as 20% of her total salary. Presumably, Helen's salary increased over the years. Mathematically, it follows that Helen's contributions to the DCP during her marriage would have been greater than those prior to marriage. At this juncture, without any records, it is impossible to know what percentage of the DCP payout was Helen's nonmarital property, and while we appreciate the family court's attempt to equitably divide the DCP, its *pro rata* division of the account does not reflect the greater income Helen would have earned during the parties' marriage, resulting in a windfall to Helen.

The family court's division of the account into marital and nonmarital property was based on nothing but speculation and conjecture, along with a sense of what it considered equitable. However, tracing requires some evidence, especially where, as here, we are dealing with educated businesspersons with several million dollars' worth of assets. In the absence of evidence to demonstrate

what amounts Helen contributed to the DCP account prior to the parties' marriage, the family court erred when it proportionally divided the account. Certainly, the family court has the discretion to divide *marital* property in just proportions; however, we cannot agree, in a case like the present, that it can simply disregard the tracing rules to award a party a nonmarital interest based simply on its notion of what is fair. Essentially, that is what occurred in this case.

Finally, we agree with Scott that the $30,265.13 cannot be used both to determine a nonmarital interest in both the 401(k) and the DCP. It was either one or the other, and it is clear based on the evidence that it reflected Helen's nonmarital interest in her 401(k) account, requiring the family court to carve off that portion of the account prior to dividing the marital portion.

In the absence of any evidence to substantiate Helen's claim regarding the nonmarital percentage of the DCP payout, the family court should have classified the payout as marital, and therefore, the beach house as marital. Of course, this does not mean that the family court was required to divide the beach house evenly between the parties, and we will not substitute our judgment for that of the family court by ordering it do so. Therefore, while we reverse the family court's decision to award Helen a nonmarital interest in the beach house, we remand the matter to the family court to determine, within the larger context of the parties' marital property, how to divide the beach house between the parties.

### B. & C.  Scott's Income

Scott's second and third assignments of error relate to the family court's decision to impute income to him for the purpose of computing child support and maintenance.

Scott holds an undergraduate and a master's degree in mechanical engineering from the University of Louisville.  During the parties' marriage, Scott worked for Carrier Vibrating Group ("Carrier").  Over the years, he rose through the corporate ranks and eventually became part of the Senior Management Team.  Ultimately, Scott was earning well over $250,000 per year as part of his compensation from Carrier.  In fact, according to Helen, in the years prior to dissolution, Scott earned an average yearly income of $304,812.00, which was comprised of his base salary and annual bonuses.  Scott was terminated from his employment at Carrier in August 2020 when it was discovered that he had violated the company's nonfraternization policy by engaging in a romantic relationship with one of his co-workers and had lied to his superiors about the relationship.  Even after his termination, Carrier offered to rehire Scott at the same salary and benefits level in its European division.  However, Scott declined this offer because it would have required him to relocate abroad.

Scott remained unemployed from August 2020 until approximately January 2021 when he secured new employment making approximately $130,000

per year. On May 10, 2021, Scott disclosed that he had recently obtained a vice-presidency position at Air Equipment Company, earning $160,000 per year, with a 40% commissions opportunity on company profits plus significant benefits. Scott explained that his $160,000 base salary constituted a "draw" against future commissions and, to the extent that his portion of the total sales commissions each year did not cover the draw, that shortfall would be debited against future commissions. Scott testified he would begin to receive bonus money above and beyond his base salary only when his commissions exceeded the draw amount, and all draw shortfalls were repaid. Scott was unsure how long it would take for his commissions to grow to the point that his share exceeded his base salary; however, he testified that this new position had the potential to allow him to generate income greater than he had been making at Carrier.

After considering the evidence, including testimony from Carrier's CEO, the family court concluded that Scott lost his job because of his own actions in violating company policy and that he persisted in violating company policy even after having been warned that such conduct would violate company policy and could lead to his dismissal.[6] Combining this fact with the fact that Scott's new

---

[6] It appears that Scott lied about being romantically involved with the coworker when first confronted and then continued the relationship despite having signed a nonfraternization agreement. Ultimately, Carrier dismissed Scott after it obtained independent proof of the continuing relationship.

position provided him with a higher base and the ability to generate greater income through commissions, the family court found it was "entirely appropriate and within its discretion to impute a salary of $250,000 per year onto [Scott] for purposes of child support and maintenance."

"In calculating child support obligations, income may only be imputed to parents when the parent is voluntarily unemployed or underemployed, and such a calculation is to be based upon the parent's potential income." *Lambert v. Lambert*, 475 S.W.3d 646, 653 (Ky. App. 2015). Pursuant to KRS 403.212(3):

> (e) 1. If there is a finding that a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, except that a finding of voluntary unemployment or underemployment and a determination of potential income shall not be made for a parent who is incarcerated, physically or mentally incapacitated, or is caring for a very young child, age three (3) or younger, for whom the parents owe a joint legal responsibility;
>
> 2. A court may find a parent is voluntarily unemployed or underemployed without finding that the parent intended to avoid or reduce the child support obligation; and
>
> 3. Imputation of potential income, when applicable, shall include consideration of the following circumstances of the parents, to the extent known:
>
> > a. Assets and residence;
> >
> > b. Employment, earning history, and job skills;

c. Educational level, literacy, age, health, and criminal record that could impair the ability to gain or continue employment;

d. Record of seeking work;

e. Local labor market, including availability of employment for which the parent may be qualified and employable;

f. Prevailing earnings in the local labor market; and

g. Other relevant background factors, including employment barriers;

In contrast, the maintenance statute, KRS 403.200, does not explicitly include a similar provision permitting a court to impute income to a voluntarily unemployed or underemployed spouse. In determining if a spouse is entitled to maintenance, a trial court must find, among other things, that the spouse seeking maintenance "[i]s unable to support [herself] through appropriate employment[.]" KRS 403.200(1)(b).

> To set the appropriate amount and duration of maintenance under KRS 403.200(2), the court must consider several factors, including a spouse's financial resources, ability to find appropriate employment, and the standard of living enjoyed during the marriage. . . . [I]t is implicit in this statutory language that a court may impute income to a voluntarily unemployed or underemployed spouse to determine . . . maintenance[.]

*McGregor v. McGregor*, 334 S.W.3d 113, 117 (Ky. App. 2011). This makes logical sense because the maintenance statute requires the family court to consider

-16-

the payor's ability to meet his reasonable needs in relation to the needs of the payee. If the payor spouse's current income is not consistent with his earning capacity, especially as demonstrated by his past salary, the family court should be able to impute income to the payor.

While the family court did not explicitly use the term "voluntarily underemployed," it is clear to us that it made such a determination. The family court noted that Scott's prior employment provided him with a yearly income above $250,000 and that he was terminated from that employment due to his voluntary actions of continuing to engage in a romantic relationship with a co-worker after clearly having been apprised that his company considered such conduct a serious violation of its policies and that such conduct could lead to dismissal. Scott's decisions were voluntary and negatively impacted his yearly earnings, at least in the short term.

Next, based on a review of the family court's entire opinion, it is clear to us that the family court considered the relevant factors in the context of the evidence to reach a reasoned and just determination regarding the amount of income to impute to Scott. Even though Scott had a noncompete agreement, he was able to secure new employment, which according to his own testimony provided him with a realistic opportunity to make even more money than he had been making at Carrier. Considering all the relevant factors, it was not an abuse of

-17-

discretion for the family court to impute a yearly income of $250,000 to Scott for purposes of assessing child support and maintenance. The yearly salary the trial court imputed to Scott, $250,000, was less than Scott had been making when he was terminated from Carrier and certainly within the range Scott believed he could make at his new position. Given Scott's education and work history, it was an entirely reasonable sum.

In conclusion, we can discern no errors of either fact or law with respect to the trial court's imputation of income to Scott that require us to vacate the family court's maintenance or child support awards.

### D. Helen's Income

Scott's fourth assignment of error concerns the family court's decision to impute a yearly income of $20,025.60 to Helen. Scott asserts that the family court abused its discretion by not imputing a higher income to Helen.

Helen has a bachelor's degree in economics from the University of Delaware. From the late 1990s to August 2014, Helen was employed in the field of commercial real estate marketing and management. Her longest term of employment was managing large shopping centers for Macerich. In 2014, after the shopping center she was managing was sold to another company, Helen and Scott agreed that Helen would leave the workforce to take care of the children and the family's home instead of looking for another position. After Helen and Scott

separated, she obtained a part-time position at Michael's, a craft store. At the

hearing, Helen testified that she was actively looking for a fulltime position within

her areas of expertise but, despite having applied for dozens of positions, she had

been unable to secure anything. Helen testified that she believed her seven-year

employment gap was a significant barrier to her obtaining a higher paying job. She

also testified that, due to the children's schedules, some of the positions she had

identified did not provide enough flexibility in hours to accommodate her

schedule.

Helen requested an award of maintenance, and Scott asserted that

the family court should impute a yearly salary of at least $50,000 to Helen for the

purposes of calculating the amount and duration of her maintenance. Ultimately,

the family court imputed a yearly income of $20,025.60 to Helen. It reasoned as

follows:

> As previously established, the Parties enjoyed a high standard of living and they were married for over eighteen (18) years. For half of the marriage, [Helen] worked outside the home, but for the second half, she was the primary caregiver for the Parties' children. [Helen] offered testimony and submitted a list of her attempts to find employment since the separation. [Helen's] most recent earnings were $2,500.00 per year from her part-time job at Michael's Craft Store. Despite evidence of her efforts, [Helen] has not been able to retain more lucrative employment and will likely continue at the $10.00 per hour position for some time. [Scott] argued that [Helen] has been voluntarily under-employed for years and requests that the Court impute a

salary of at least $50,000 based on her education levels and job history prior to 2013.

. . .

First, we turn to [Helen's] circumstances and earning potential. The Court recognizes that the Parties agreed [Helen] would exit the workforce over seven (7) years ago to provide care for their two children. This gap in employment and the unprecedented challenges presented by COVID-19 certainly represent barriers to an easy return to her previous field in commercial real estate. Given the relative age of the Children, the Court is also compelled by [Helen's] testimony that without both Parties contributing to work-related childcare costs, her job search is limited to positions that afford a certain amount of flexibility. Given this testimony and the evidence presented, the Court does not believe imputing a salary of $50,000 on [Helen] would be reasonable or fair. However, the Court also believes that absent disability, a person with [Helen's] education, experience and similarly-situated, should be able to earn more than $2,500 per year. The Court, therefore, is willing to impute a full-time salary at her current wage ($10.43 x 160 hours a month x 12 months) on [Helen] for a total of $20,025.60 per annum. Since the properties awarded to [Helen] pursuant to the evidence do not produce income over and above the operating expenses and taxes, no additional income is attributed to [Helen] for those properties.

Under the maintenance statute, the family court has "dual responsibilities: one, to make relevant findings of fact; and two, to exercise its discretion in making a determination on maintenance in light of those facts." *Wattenberger v. Wattenberger*, 577 S.W.3d 786, 788 (Ky. App. 2019). The family court's factual findings regarding Helen's work history, decision to leave the

workforce, current employment, and attempts to secure higher wages are supported by the record. Moreover, we cannot discern any abuse of discretion by the family court in refusing to impute a higher income to Helen. While Scott is correct that Helen is educated and likely will be able to secure a higher paying job in time, the family court appropriately reasoned that it would be unfair to impute Helen the full amount of income requested by Scott. To this end, the family court considered the fact that Helen had been out of the workforce for a considerable amount of time. The family court also considered the efforts she had undertaken thus far to secure a higher paying job within her experience that would still provide her with the necessary flexibility to care for the parties' children. Even so, the family court determined that Helen had the present ability to make more than she testified that she had earned working a very truncated part-time schedule at the craft store.

Additionally, the family court did not order maintenance in perpetuity. It ordered Scott to pay maintenance for five years. Given that the purpose of maintenance is to allow the payee spouse time to secure appropriate employment to meet her needs, we cannot conclude that the family court abused its discretion by not imputing a higher annual salary to Helen.

### E. Child Support

Scott's fifth assignment of error is that the family court erred in deviating from the child support guidelines. Scott's argument hinges on the

amount of his yearly gross income. If, as Scott argues, the trial court erred in imputing him income for purposes of child support instead of using the $160,000 he testified is his current salary, then this would not be an above the guidelines case. However, as set forth above, we have concluded that the trial court did not abuse its discretion when it set his yearly income at $250,000 instead of $160,000. Based on the incomes imputed to the parties, $250,000 and $20,025.60, this was an above-the-guidelines case according to the combined income chart in effect at the time.

KRS 403.211(5) provides that a court may use judicial discretion in determining child support in circumstances where the combined adjusted gross parental income exceeds the uppermost level of the child support guidelines. In *McCarty v. Faried*, 499 S.W.3d 266, 273 (Ky. 2016), the Kentucky Supreme Court cautioned against imposing an "overly burdensome standard" on family courts in above-the-guidelines cases. The opinion instructs that:

> [W]hen setting child support over and above the guidelines, [the lower court's order] must be based on the best interest of the child. When making that determination, a trial court may use its judicial discretion with regard to weighing factors such as: the needs of the child, the financial circumstances of the parents, and the reasonable lifestyle the child may have been accustomed to before or after the parents separated. On review, an order setting child support above the guidelines will be affirmed so long as the trial court sets out specific supportive findings and the award, as a whole, is reasonable in light of those findings and the record.

-22-

*Id.* (footnote omitted).

Here, we can discern no abuse of discretion in how the family court calculated child support. As the family court noted, this family, including the children, enjoyed a high standard of living during the parties' marriage. The family court heard extensive testimony on the children's claimed needs and the parents' ability to meet those needs financially. The amount set by the family court was within the range of reasonableness given what these parties had traditionally spent on their children and was clearly calculated to meet the children's needs without being excessive.

### F. Attorney's Fees

Scott's last argument is that the family court erred when it ordered him to pay all Helen's attorney's fees (minus a $2,500 retainer). Scott argues that since both parties were awarded over a million dollars in marital assets, the trial court abused its discretion in this regard as Helen certainly had enough assets to pay her own fees. Regarding its attorney fee award, the family court stated:

> While the Court must consider the financial resources of the parties it need not find that a financial disparity exists in favor of one party as a prerequisite to making an award of fees to the other. *Smith v. McGill*, 556 S.W.3d 552 (Ky. 2018). The Court need not make specific findings regarding the financial resources of the parties, it is enough that such resources were considered. *Miller v. McGinty*, 234 S.W.3d 371 (Ky. App. 2007).

[Helen] testified that [Scott's] actions have exacted a substantial emotional and financial toll. [Helen] alleges that through the course of this litigation, [Scott] repeatedly removed funds from the marital accounts, refused to disclose personal bank account balances, [and] refused to provide financial information. She also alleges that he forged her name on listing documents. [Helen] asserts that all these actions increased her litigation costs. Additionally, [Helen] argues that the specious and unfounded allegations against her related to [Scott's] dismissal from Carrier required depositions and discovery that would have otherwise been unnecessary.

In support of these allegations, [Helen] pointed to two (2) Motions in early 2021 that were addressed during Trial. Her January 1, 2021 Motion to Compel resulted in an Order to compel supplemental discovery answer. As of Trial, [Scott] had still not provided complete documentation to [Helen] or the Court. [Helen] also had to file a February 2, 2021 Motion to Escrow Funds, to Change Florida Property Management Companies, and Mandate Rental Deposits after she uncovered [Scott's] attempt to sell the Florida condo without her knowledge. In contrast, it appears [Helen] has complied with all Court Orders.

This Court finds that based upon the financial resources of the parties and the behavior of [Scott], he shall be solely responsible for the sum of fees incurred by [Helen] so far. The Court finds that there is disparity of income, even with the substantial resources allocated in this Order, between these parties that such an award of attorney fees is appropriate and fair. The Court finds that [Scott] has the superior financial ability, was the source of increased litigation costs, and under the factors of KRS 403.200, he shall be responsible for incurred fees to date, minus the $2,500 retainer which was a debt allocated to [Helen].

The family court correctly noted that a finding of financial disparity is no longer required to support an award of attorney's fees under KRS 403.220. The attorney's fees statute provides as follows:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

*Id.* "The statute does not require that a financial disparity must exist in order for the trial court to [award attorney's fees]; rather, that language is a creature of case law born out of this Court's decisions – and today, we slay this forty-year-old dragon hatched from precedent." *Smith*, 556 S.W.3d at 556. Rather, as the *Smith* court held, the statute simply requires the lower court to consider the financial resources of the parties, prior to ordering one party to pay the other parties' attorney's fees. In addition to the parties' financial resources, the lower court may also consider whether one party used "domineering tactics and manipulation" to drag out the proceedings to the financial detriment of the opposing party. *Rumpel v. Rumpel*, 438 S.W.3d 354, 365 (Ky. 2014).

While Scott is correct that Helen was awarded a substantial amount in marital assets, the family court was not required to find a financial disparity existed

-25-

between the parties at the time of its award so long as it considered the parties' financial resources. Clearly, the family court considered the parties' resources. It specifically noted that notwithstanding the division of marital property, Scott still enjoyed a substantially higher income than Helen. It further considered the fact that, during the litigation, Scott engaged in tactics that prolonged the litigation. It was proper for the family court to do so, and given its detailed findings and conclusions, we cannot appreciate how it abused its discretion in this regard.

### III. APPEAL NO. 2021-CA-1494-MR

In her cross-appeal, Helen asserts three errors by the family court which she asserts require us to vacate and remand various portions of the orders at issue: (1) the family court erred in failing to award Helen any portion of her dissipation claim against Scott; (2) the family court erred by not requiring Scott to honor his contractual agreement to pay for private school tuition for the children; and (3) the family court abused its discretion by failing to use Scott's average income from prior years to set maintenance and child support.

### A. Dissipation Claim

Helen's first assignment of error is that the family court erred in not accepting her dissipation claim. Helen asserts that a series of intentional acts by Scott negatively impacted the marital estate in the amount of $181,385.98, broken down as follows:

(1) Health I EDI Testosterone/ GYM, $6,854.91; (2) Trip/Gift/lingerie/Experiences not with family, $20,211.74; (3) Beach House money deposited into SW13 Acct Missing, $37,215.74; (4) Check/ Large Cash Withdraws Without back up $12,990.60; (5) Deposits from Unaccounted/New Accounts/questionable $92,112.99; and (6) Money taken from Joint Accounts (PNC), $12,000.00.

Helen requested that the family court award her one-half of the dissipated asset claim. The family court considered Helen's dissipation claim and concluded:

> [Helen] argued during the trial that [Scott] dissipated marital assets and requested the Court make her whole. Under Kentucky law, this Court has the authority to make an unequal assignment of the marital estate if it finds that a party has expended marital property "(1) during a period when there is a separation or dissolution impending; and (2) where there is a clear showing of intent to deprive one's spouse of her proportionate share of the marital property." *Brosick v. Brosick*, 974 S.W.2d 498, 500 (Ky. App. 1998).

> Generally speaking, "[a] party is free to dispose of his marital assets as he sees fit so long as such disposition is not fraudulent or intended to impair the other spouse's interest such that it may properly be classified as a dissipation of the marital estate." *Duffy v. Duffy*, 540 S.W.3d 821, 828 (Ky. App. 2018) (quoting *Ensor v. Ensor*, 431 S.W.3d 462, 472 (Ky. App. 2013). A spouse claiming asset dissipation has the burden of showing the Court by a preponderance of the evidence that marital assets are missing or have been reduced during a period of separation and the value of the property purportedly dissipated. *See Bratcher v. Bratcher*, 26 S.W.3d 797 (Ky. App. 2000). Once that occurs the spouse accused of dissipating assets must prove the assets were utilized for a marital purpose. *Id.*

At Trial [Helen] testified that she had made a line-by-line examination of [Scott's] expenditures and concluded that he had dissipated approximately $181,000.00 since the beginning of 2019. [Helen] testified that the marital bank accounts had decreased from over $100,000 in savings to less than $25,000 during this period. While some of this loss can be attributed to the period of [Scott's] unemployment, [Helen's] testimony outlined that as early as 2019, [Scott] was paying for, buying gifts for, and taking trips with his paramour using marital funds. [Helen] testified that she believes he has continued these actions for the period of this divorce litigation as well. [Helen] also testified that [Scott] cashed out funds (Ameritrade), spent monies on [his paramour], falsified documents in [Helen's] name, lost his job, refused a larger severance package, and otherwise transferred assets away from the marital estate. [Citation to record omitted.] [Helen] testified that some actions of dissipation were obvious like the purchase of plane tickets, women's lingerie, and clothing while other actions were more surreptitious like moving money around, failing to deposit rental income, and receiving money/cash from different sources. [Citation to record omitted.]

[Scott] testified that many of these expenditures were just day-to-day living expenses. [Scott] argued he was entitled to spend money that did not directly benefit the marital estate so long as he did not intend to deprive [Helen] of a marital asset. [Scott] further argued that [Helen] failed to provide any proof beyond her testimony to make her case for dissipation.

While the Court is sympathetic to [Helen's] argument and believes [Scott] likely did dissipate marital funds, the Court simply does not have enough probative evidence beyond contradictory testimony on which to base an award. "While the circuit court does have the authority to fashion equitable relief where a party has dissipated marital property, that relief must bear some

> relation to the evidence presented." *Brosick v. Brosick*, 974 S.W.2d 498, 501 (Ky. App. 1998). Therefore, the Court reluctantly and respectfully finds that [Helen] has failed to meet her evidentiary burden and her request for dissipation relief is DENIED.

As Scott notes, Helen merely testified before the trial court as to what she believed Scott had spent without backing up her testimony with sufficient documentary evidence. The family court was left only with Helen's testimony that Scott's expenditures were improper versus Scott's testimony that the expenses were incurred as part of daily living. In the face of such contradictory evidence, the family court determined that it could not find that Scott had dissipated assets.

Clear and convincing evidence is not required to shift the burden of proof to the alleged dissipator to show the marital assets were not used for nonmarital purposes. *Bratcher v. Bratcher*, 26 S.W.3d 797, 799 (Ky. App. 2000). Rather, the proper standard is a preponderance of the evidence. *Id.* at 800. Under this standard, Helen was required to establish that it was more likely than not that Scott had dissipated marital assets. As the trial court noted, however, it was confronted with contradictory oral testimony, which did not tip the evidentiary scale in favor of Helen. Given her failure to produce sufficient documentary evidence to support her assertions, we cannot conclude the family court abused its discretion in denying Helen's claim.

## B.  Private School Tuition

Helen asserts that the family court erred refusing to honor the parties' "agreement" that their children would continue to attend private school.  To be clear, to the extent there was any such "agreement," it was not a contractual one as it lacked the essential element of consideration.  Although Scott may have agreed in theory to send the children to private school during the marriage, any such agreement was not binding on him.  In the absence of consideration to support the agreement, Scott was free to change his mind, which apparently, he did.  Thus, the parties' "agreement" or lack thereof was not material to the family court's determination.  Given the lack of evidence in the record that "the public schools of Jefferson County are inadequate for educational purposes for these children and no proof that any of the children suffer a handicap that would make public schools unsuitable," the family court did not err in determining that Scott was not required to pay for their private schooling.  *Miller v. Miller*, 459 S.W.2d 81, 83-84 (Ky. 1970).

## C.  Scott's Income

Helen's third assignment of error involves the amount of income the family court imputed to Scott.  As noted above, at the time of the hearing, Scott was making a base salary of $160,000.  The family court determined, however, that additional income should be imputed to Scott for purposes of child support and

maintenance, and it imputed him with $250,000 in annual income. Helen believes that the family erred by not imputing him with more income. Specifically, Helen asserts that the family court should have imputed Scott's annual income at $304,812, which she claims was his average annual salary prior to his termination. Although she acknowledges that the family court has discretion with respect to the amount of imputed income, Helen argues that, because the family court "accepted many of the facts submitted by Helen . . . [u]nder these circumstances the [family court] should have used her verified numbers." As Helen acknowledges, the family court has considerable discretion with respect to both maintenance and child support. Having carefully reviewed the record in combination with the family court's orders, we can discern no abuse of discretion. The family court imputed an income to Scott that was entirely appropriate. Moreover, the family court properly considered the children's reasonable and necessary expenses considering the parties' incomes and made a reasoned and well-articulated order regarding the amount of support necessary to provide for them. The fact that the family court accepted some of Helen's arguments and rejected others does not in any universe rise to the level of an abuse of discretion.

## IV. CONCLUSION

For the reasons set forth above, as to Appeal No. 2021-CA-1427-MR, we affirm in part, reverse in part, and remand for entry of an amended order consistent with this Opinion, and as to Appeal No. 2021-CA-1494-MR, we affirm.

ALL CONCUR.

BRIEFS FOR APPELLANT/CROSS-APPELLEE:

Louis I. Waterman
Spencer J. Brooks
Prospect, Kentucky

BRIEFS FOR APPELLEE/CROSS-APPELLANT:

Callie Walton
Louisville, Kentucky